Lawrence WENDLAND, Individually and as Personal Representative of the Estate of Callie Rose Wendland, Appellant,

v.

Stephen SPARKS and Davis County Hospital, Appellees.

No. 96–1576.

Supreme Court of Iowa.

Feb. 18, 1998.

Thomas P. Slater, Des Moines, for appellant.

Steven K. Scharnberg and Glenn Goodwin of Finley, Alt, Smith, Scharnberg, May & Craig, P.C., Des Moines, for appellee Stephen Sparks.

Marion H. Pothoven and Julie B. Fisher of Pothoven, Blomgren & Stravers, Oskaloosa, for appellee Davis County Hospital.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and SNELL, JJ.

LARSON, Justice.

Callie Rose Wendland, who was suffering from several diseases, including multiple myeloma, died at the Davis County Hospital. Her estate and her husband sued the hospital and one of her treating doctors, Stephen Sparks, for failing to administer cardiopulmonary resuscitation (CPR) following her respiratory arrest in the hospital. The court granted summary judgment against the plaintiff on the ground that he could not establish that the failure to administer CPR was the proximate cause of Callie's death. Because this summary judgment deprived the plaintiff of a claim for lost chance of survival, we reverse and remand for further proceedings.

## I. *The Facts.*

The summary judgment record, which we view in the light most favorable to the plaintiff, reveals the following facts: Callie Wendland had been hospitalized at various times in the two months preceding her admission to this hospital on January 31, 1994. She had been suffering from several diseases, including fibrotic lung disease and multiple myeloma (cancer of the plasma cells). The multiple myeloma was apparently in remission at the time she was admitted to the hospital; she was admitted primarily to regain her strength. According to a plaintiff's expert, Callie "seemed to be doing reasonably well and be fairly healthy in the context of a woman who obviously had a chronic illness and symptoms that were unexplained."

At approximately 4:40 a.m. on February 24, 1994, Callie suffered cardiorespiratory arrest. A nurse obtained a "crash" cart, which was equipped to perform electrocardiogenic shock. Another nurse contacted the defendant, Dr. Sparks. Dr. Sparks arrived at Callie's room approximately at the time she was drawing her last breath. He assessed the patient by feeling for a pulse, listening for heartbeats, looking for a respiratory effort, and checking her eyes. The doctor decided not to attempt CPR, and the crash cart was never used, although there was evidence in the summary judgment record that resuscitative efforts might have been successful.

One nurse testified in her deposition that Dr. Sparks said, "I just can't do it to her," and he told the nurses not to attempt to resuscitate her. Dr. Sparks testified that he did not believe he made the statement, "I just can't do it to her," but he agreed that he had told the nurses that "no code would be made," meaning that there should be no further attempts to resuscitate the patient. This nurse testified that, if Dr. Sparks had not intervened, the nurses would have "called a code" and performed CPR. Dr. Sparks testified that he would have expected them to perform CPR if he had not been there.

Ordinarily, a patient, or a family member who does not wish to have the patient resuscitated, signs a "no code" request, which is placed in the patient's records. In this case, neither Callie nor a family member had made such a request. In fact, Dr. Sparks testified in his deposition that he was "very aware of [the patient's husband's] desire to see her on a ventilator, again, if she needed it." The doctor testified that, when Callie had previously suffered respiratory arrest, she had been resuscitated. The number of previous resuscitations was not clear, but Dr. Sparks thought that it was three.

## II. *The Suit.*

Callie's husband, Lawrence Wendland, as husband and personal representative of Callie's estate (collectively the plaintiff), sued the hospital and Dr. Sparks for "failing to promptly initiate appropriate care to treat decedent's arrest." The defendants moved for summary judgment on the ground that the plaintiff was not able to generate a fact issue on proximate cause because he could not produce any substantial evidence that the patient's death was the *probable* result of the defendants' negligence.

The plaintiff resisted the motion for summary judgment and in a brief in support of his resistance asserted, for the first time, that the defendants' negligence deprived the patient of a chance to survive, a basis for recovery that he claims does not require the "more probable than not" showing of proximate cause.

## III. *The Issue.*

One of the nurses who had attended the patient at the time of death testified in her deposition that the doctor's order to stop any resuscitation effort was "an act of mercy." We agree that this might well be so because another successful resuscitation was not a certainty; and even if Callie had been revived, her prospects for a quality life were not good. These considerations, however, are not before us. The defendants have not challenged the ability of the plaintiff to show negligence or damages. The sole issue is whether proof of "probable" causation is required in a loss-of-chance case. Subsumed in that issue are the threshold questions of whether we will recognize a loss-of-chance claim under these facts and whether the plaintiff has sufficiently raised the issue.

■ A. *Sufficiency of the pleading.* The plaintiff's petition alleged that:

6. Defendants were negligent in failing to promptly initiate appropriate care to treat decedent's arrest [and]

7. Defendants' negligence was a proximate cause of decedent's subsequent injury and ultimate death.

■ The plaintiff did not specifically allege a loss-of-chance theory, nor was he required to do so. The notice-pleading rule in effect then required only "a short and plain statement of the claim showing that the pleader is entitled to relief." Iowa R. Civ. P. 69(a) (This rule is now found, in substantially the same form, in rule 70(a), effective January 24, 1998.). Under this rule,

> the pleader is not required to identify specific theories of recovery; the petition need only apprise the opposing parties of the incident giving rise to the claim and of the general nature of the action. This does not mean that a party may not be limited to a specific theory of recovery when he limits his pleading or his presentation to the court to certain exclusive theories.

*Pendergast v. Davenport,* 375 N.W.2d 684, 689 (Iowa 1985) (citations omitted).

In this case, the plaintiff made it clear, at least as early as his resistance to the summary judgment, that he was relying on a theory of lost chance of survival. His resistance brief stated, in part:

> Dr. Podell's testimony contained within his deposition and letter dated January 4, 1996 ... clearly states that Callie was deprived of the "opportunity" to have been resuscitated. This element of damage has been recognized by the Iowa Supreme Court in medical malpractice actions as the loss of opportunity to survive. It is well recognized in Iowa. *Sanders v. Ghrist,* 421 N.W.2d 520 (Iowa 1988); *DeBurkarte v. Louvar,* 393 N.W.2d 131 (Iowa 1986). It is clear that a fact question concerning the proximate cause of this element of damage has been generated in this case.

In granting summary judgment against the plaintiff, the district court did not address his lost-chance issue. Because the court granted summary judgment on the whole case, Iowa Rule of Civil Procedure 237(c) allowed the plaintiff to file a motion to enlarge under rule 179(b), and he did so here. In his rule 179(b) motion, he again urged the court to consider his claim for lost chance, stating that there was medical evidence in the record establishing that Callie

> would have had a ten per cent (10%) chance of leaving the hospital [and these facts] are sufficient to generate a fact

question that by not attempting resuscitative efforts, Dr. Sparks deprived Callie Wendland of the opportunity or chance to survive.

In their resistance to the plaintiff's rule 179(b) motion, the defendants acknowledged that the loss-of-chance argument was in the case, but they argued that such a theory is limited to medical malpractice based on failure to diagnose and that this case does not fall in that category. (We address this question later in this opinion.) We conclude that the plaintiff adequately raised the lost-chance theory.

B. *Principles of review.* We review an order granting summary judgment for errors of law. *In re Estate of Renwanz,* 561 N.W.2d 43, 44 (Iowa 1997); Iowa R.App. P. 4. As we explained in *Huber v. Hovey,* 501 N.W.2d 53 (Iowa 1993):

> When reviewing a grant of summary judgment we ask whether the moving party has demonstrated the absence of any genuine issue of material fact and is entitled to judgment as a matter of law. The resisting party must set forth specific facts showing that a genuine factual issue exists. Summary judgment is proper if the only issue is the legal consequences flowing from undisputed facts.

*Huber,* 501 N.W.2d at 55 (citations omitted).

The burden of proof is on the party moving for summary judgment to show that no genuine issue of material fact exists, and the court must view the evidence in the light most favorable to the opposing party. *Oswald v. LeGrand,* 453 N.W.2d 634, 635 (Iowa 1990).

### IV. *The Lost–Chance Theory.*

A. *In general.* The lost-chance theory has often been urged in cases against intervening tortfeasors in which the plaintiff cannot meet the traditional requirements for showing proximate cause by the "probable" standard required by cases such as *Bradshaw v. Iowa Methodist Hospital,* 251 Iowa 375, 383, 101 N.W.2d 167, 172 (1960) ("[M]edical testimony [that] it is possible [that] a given injury was the cause of subsequent disability or 'could have' caused it is insufficient.... Testimony indicating *probability*

*or likelihood* of such causal relation is necessary." (Emphasis added.)), and *Chenoweth v. Flynn,* 251 Iowa 11, 16, 99 N.W.2d 310, 313 (1959) (proximate cause is "a primary ... or predominating cause").

The causation inquiry has traditionally had an all-or-nothing effect on the outcome of a tort claim. Unless a causal connection is established under the applicable standard of proof (usually requiring that it appear more likely than not), the plaintiff will receive nothing for the loss in question.

Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353, 1356 (1981) [hereinafter King].

In discussing the viability of the all-or-nothing approach, one authority has stated:

> On a more visceral level is the question whether one who loses a not-better-than-even chance of achieving some favorable result, perhaps life, really loses nothing worthy of redress. The loss includes not only the then-existing chance, but also the loss of the opportunity to benefit from potential scientific breakthroughs that could transform the chance into reality. From a psychological standpoint, there is a qualitative difference between a condition that affords a chance of recovery and one that offers no chance at all, as any patient with terminal cancer will confirm. This inherent worth of a chance is added reason for recognizing its loss as a compensable interest.

*Id.* at 1378.

Under the lost-chance theory, a victim who suffers from a preexisting adverse condition (in this case the patient's cancer and other diseases) and is then subjected to another source of injury (here, the failure to resuscitate) may have a claim for the second event. The rationale is that, if it were not for the second event, the victim might have survived the first. This loss of chance is to be treated and evaluated independently from the preexisting condition. *Id.* at 1370. Thus,

[a] plaintiff could claim that, as a result of the intervention of the defendant's tortious conduct, he lost the chance to recover from the preexisting condition or otherwise avoid some untoward consequence of it.... For example, a victim of cancer could be killed on the operating table because of negligently administered anesthesia. The plaintiff would recover for the extent to which the decedent's death was accelerated, but would receive no damages for the value of the decedent's chance of being cured of the disease unless that chance rose to the requisite [more likely than not] level.

*Id.*

While the traditional rule is that a defendant "takes his victim as he finds him," the lost-chance concept is compatible with that rule. As stated by one author,

[t]he "take him as you find him" rule does *not* ... make the victim's preaccident condition irrelevant. The preexisting condition of the victim should be considered in assessing the value of the interest destroyed or affected. That a terminally ill victim would have died on Tuesday, the next day, does not prevent the defendant's conduct from being a cause of his death on Monday, but would obviously be quite relevant to the question of damages. In essence, the "take him as you find him" rule simply means that the extent of the victim's actual injury from the accident need not have been reasonably foreseeable.

*Id.* at 1361 (footnote omitted).

B. *The lost-chance theory in Iowa.* We first recognized a claim for lost chance of survival in the case of *DeBurkarte v. Louvar,* 393 N.W.2d 131 (Iowa 1986). Even before we decided *DeBurkarte,* a federal court in a diversity case had made an "informed prophecy," *Moores v. Greenberg,* 834 F.2d 1105, 1112 (1st Cir.1987), that this was the state of the Iowa law. *See O'Brien v. Stover,* 443 F.2d 1013, 1018 (8th Cir.1971) (recognizing loss of chance in negligent-diagnosis case).

The *DeBurkarte* case involved a lost chance of survival based on a doctor's failure to diagnose the patient's cancer at an earlier time when, according to medical evidence, she had a fifty to eighty percent chance of survival. *DeBurkarte,* 393 N.W.2d at 137. We analyzed two lines of authority. Under an "all or nothing" line of authority, a plaintiff could recover all damages for the death, even those attributed to the preexisting disease, if the plaintiff had lost a fifty percent or better chance of survival because of the intervening act. On the other hand, under that theory a plaintiff who could prove less than a fifty percent chance would recover nothing against the second tortfeasor, even though the lost chance should have been attributed some value. We rejected this "all or nothing" approach because it "clearly distorts the traditional principles of causation." *Id.* Our rejection of this approach finds support in another authority:

Most courts have misperceived the nature of the interest destroyed by failing to identify the destroyed chance itself as the compensable loss. Instead, they have treated the chance of avoiding the loss as if it were either a certainty or an impossibility, depending on whether, (under the traditional standard of proof) the tortiously reduced likelihood of loss avoidance was better than even. Thus, the plaintiff will recover for a lost opportunity only if it appears more likely than not that but for the tort some definitive adverse result would have been avoided. His recovery, however, will not be discounted by the chance that the loss might have occurred even absent the tort. Conversely, the plaintiff recovers nothing for the lost chance if the probability of that chance does not rise to the level required by the applicable [more-likely-than-not] standard of proof.

King, 90 Yale L.J. at 1365–66.

In *DeBurkarte* we discussed a second possible approach in a loss-of-chance case, *i.e.,* to allow damages to the extent of the percent of lost chance attributed to the intervening act of negligence. We adopted this proportional approach because we found it to be the most equitable and because it "offers 'the most administrable and consistent method for dealing with many complicated cases.'" *DeBurkarte,* 393 N.W.2d at 137 (quoting King, 90 Yale L.J. at 1378). Under *DeBurkarte* a lost chance would be evaluated independently. *DeBurkarte,* 393 N.W.2d at 137. We

followed *DeBurkarte* in *Sanders v. Ghrist,* 421 N.W.2d 520 (Iowa 1988), another failure-to-diagnose case.

Following *DeBurkarte* and *Sanders,* two issues pertinent to the present appeal remain unanswered: (1) whether the loss-of-chance theory is applicable to cases other than those based on negligent diagnosis, and (2) whether the theory is applicable when the lost chance is less than fifty percent. The first of these issues remained unanswered after both *DeBurkarte* and *Sanders* because, in contrast to the present case, they involved negligent diagnoses. The second issue, whether the theory applies to chances under fifty percent, remains unanswered because it was not necessary to resolve that issue in either of those cases. (In *DeBurkarte* the chance of survival was said to be fifty to eighty percent, 393 N.W.2d at 137, and in *Sanders* there was no discussion of the specific percentage of chance.)

## V. *Scope of Lost Chance.*

■ The defendants argue that a loss-of-chance claim is limited to cases involving negligent diagnosis. However, neither *DeBurkarte* nor *Sanders* suggests this limitation, nor have we found any authority that has done so. In fact, loss-of-chance analyses have been approved in a variety of cases of medical malpractice not involving diagnoses. *See, e.g., Blinzler v. Marriott, Int'l,* 81 F.3d 1148 (1st Cir.1996) (applying New Jersey law) (failure to make timely call for ambulance; guest lost chance of survival); *McBride v. United States,* 462 F.2d 72 (9th Cir.1972) (applying Hawaii law) (failure to admit deceased to coronary care unit of hospital); *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984) (negligence based on hospital's transfer of patient, causing delay in treatment); *Delaney v. Cade,* 255 Kan. 199, 873 P.2d 175 (1994) (doctor's treatment and delay in transferring patient, causing loss of chance for better recovery); *Haynes v. Calcasieu Med. Transp., Inc.,* 702 So.2d 1024 (La.Ct.App. 1997) (failure to defibrillate heart attack patient); *Falcon v. Memorial Hosp.,* 436 Mich. 443, 462 N.W.2d 44 (1990) (failure to accord patient chance of survival by connecting intravenous line); *Olah v. Slobodian,* 119 N.J. 119, 574 A.2d 411 (1990) (lost chance based in part on failure to make surgical intervention).

The loss-of-chance claim has also been recognized in cases that did not involve medical malpractice at all. *See, e.g., Gardner v. National Bulk Carriers, Inc.,* 310 F.2d 284 (4th Cir.1962) (sailor lost at sea; loss of slight chance to survive in sea recognized); *Hake v. Manchester Township,* 98 N.J. 302, 486 A.2d 836 (1985) (prisoner suicide; failure to render prompt care denied chance of survival).

We reject the defendants' argument that a loss-of-chance claim is limited to medical-diagnosis cases and conclude it is applicable to the facts of this case.

## VI. *Damages for Loss of Less Than Fifty Percent Chance.*

■ Under traditional concepts of proximate cause, the all-or-nothing approach would result in no compensation at all because of the failure to establish a better-than-even chance of recovering.

A more rational approach, ... [as contrasted to the over fifty percent requirement,] would allow recovery for the loss of the chance of cure even though the chance was not better than even. The probability of long-term survival would be reflected in the amount of damages awarded for the loss of chance. While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant's negligence, he could show by a preponderance that he was deprived of a 30% chance of a cure.

*DeBurkarte,* 393 N.W.2d at 137 (quoting King, 90 Yale L.J. at 1363–64). *DeBurkarte* held that recovery in a loss-of-chance case would be based on the percentage of lost chance and not on the overall damages attributed to all sources of all liability; the percentage of lost chance would be reflected in the damages awarded. *Id.*

In the present case, in which the chances of successful resuscitation were questionable and any recovery for wrongful death would be severely limited because of the patient's preexisting condition, even a small chance of survival is worth *something.* As one authority has observed,

[s]ome courts have recognized the compensability of the loss of a chance in the case of a contest. Obviously, when a chance to win a contest has a clearly defined market value—as in the case of a lottery ticket—there is little difficulty in viewing the chance as an asset. It would be absurd to say that a one dollar lottery ticket had no value merely because the prospects of winning with it were not better than even.

King, 90 Yale L.J. at 1378 (footnote omitted).

Cases from other jurisdictions have held that lost chance under fifty percent is nevertheless compensable. *See, e.g., Jeanes v. Milner,* 428 F.2d 598 (8th Cir.1970) (Arkansas law) (reduction of patient's chances of survival from thirty-five percent to twenty-four percent held sufficient for finding of proximate cause); *Gardner,* 310 F.2d at 286–87 (slight chance of survival of sailor lost at sea held to be compensable); *Roberson v. Counselman,* 235 Kan. 1006, 686 P.2d 149 (1984) (evidence sufficient on testimony of forty percent maximum chance); *Falcon,* 462 N.W.2d at 56 (loss of estimated 37.5% chance); *Perez v. Las Vegas Med. Ctr.,* 107 Nev. 1, 805 P.2d 589, 590 (1991) (patient "probably" would have died anyway; chance to survive nevertheless compensable); *Herskovits v. Group Health Coop.,* 99 Wash.2d 609, 664 P.2d 474 (1983) (chances reduced from thirty-nine percent to twenty-five percent; sufficient to justify compensation). *See generally* Martin J. McMahon, Annotation, *Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance,* 81 A.L.R.4th 485, 492–505 (1990) (discusses cases allowing proportional recovery for chances of less than fifty percent).

The Michigan Supreme Court has made this observation regarding the notion that in some cases any chance of survival would be so small as to simply be ignored:

The patient expects a physician to do that which is expected of physicians of like training in the community, and the physician expects the patient to pay or provide payment for the services, whether the likelihood of there in fact being any benefit to

the patient is only one through fifty percent or is greater than fifty percent.

*Falcon,* 462 N.W.2d at 51.

 *DeBurkarte* suggests that the loss of a chance of less than fifty percent is compensable, 393 N.W.2d at 136–37, and *Sanders* reinforced that suggestion, 421 N.W.2d at 522–23. We now specifically so hold and therefore reverse and remand for further proceedings.

**REVERSED AND REMANDED.**