**STATE**

v.

**Rodney PERRY.**

No. 99–137–C.A.

Supreme Court of Rhode Island.

June 8, 2001.

Virginia McGinn, Aaron Weisman, Providence, for Plaintiff.

Catherine A. Gilbran, Paula Rosin, Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

There was nothing funny about this "Clown Town" murder, yet this is how some of the witnesses referred to the South Providence neighborhood where this fatal shooting occurred. The defendant, Rodney Perry, appeals from his conviction for first-degree murder, carrying a pistol without a license, possession of a firearm after a previous conviction for a crime of violence, and carrying a weapon when committing a crime of violence. On appeal, Perry challenges a portion of the trial justice's jury instructions. The court instructed the jury to weigh the testimony of the state's medical examiner because that was the only expert opinion it had heard concerning the cause of the victim's death. Perry also faults the trial justice's refusal to allow his lawyer, during closing argument, to comment upon the state's failure to call a witness that the prosecutor had identified in his opening statement. The witness was a jailhouse informant to whom Perry allegedly had admitted his status as the shooter. Finally, Perry scores the trial justice's denial of his new-trial motion. He argues that the prosecution deliberately failed to inform the defense about the pretrial assurances it had given to an eyewitness about how it would help to relocate that witness after the trial. If this evidence had been disclosed to the defense, Perry argues, it would have had a material bearing on the outcome of the trial because of its impeachment value. We address each of these arguments below.

I

**Jury Instruction on Expert Testimony**

Douglas "Junior" Lewis died on October 25, 1995, as a result of gunshot wounds he suffered. Perry allegedly fired the bullets into Lewis on August 12, 1995. Lewis survived the shooting and was released from the hospital five days after abdominal surgery to remove a bullet, but he lost a kidney and underwent a resection of a portion of his colon. On October 22, 1995, he returned to Rhode Island Hospital complaining of nausea, vomiting and stomach pain—common side effects of Lewis's psychotropic mushroom consumption, according to the evidence adduced at trial. Although the hospital examined and released

him, he returned the next day with the same complaints. After an X-ray of his colon revealed an obstruction to the small bowel, the hospital admitted him. The next night he collapsed and died after trying to remove the intravenous tubes and apparatus from his arm.

The state medical examiner concluded that Lewis died as a result of peritonitis caused by a bowel obstruction that developed as a result of adhesions of the bowel at the area of the earlier abdominal surgery. She opined that the manner of death was homicide because the "scar formation was due to, in part, the surgery necessary to save his life * * * and also due to the gunshot itself, which necessitated the surgery." Although Perry's lawyer vigorously cross-examined the medical examiner concerning the validity of her causation conclusion, the medical examiner did not waiver or change her opinion and Perry called no expert witness to rebut her testimony.

■ At the end of his instructions to the jury, the trial justice included the following statement concerning this expert testimony:

> "In this case expert testimony has concluded, and you must weigh this, that the cause of death of the decedent was the gunshot wound that was allegedly perpetrated by this defendant. That's the only expert opinion you have with regard to cause of death."

Perry's attorney objected to this instruction, contending that by asserting, "[t]hat's the only expert opinion you have with regard to cause of death," the court was in essence instructing the jury that because the defendant had failed to counter the medical examiner's conclusion by calling its own medical expert, the jury had to find that the testimony of the prosecution's medical expert was true and uncontradicted. The trial justice rejected this suggestion and refused to instruct the jury as Perry's attorney had suggested, nor did he otherwise modify the instructions he had given.

Perry argues that the above-quoted remarks "foisted upon the jury the court's personal views regarding the weight to be afforded the only expert evidence in the case." He suggests that by concluding his instructions to the jury on the expert testimony in the way that he did, the trial justice effectively undid all his prior instructions concerning expert evidence and "crossed the line between assisting the jury, which is his duty, and encroaching upon the jury's responsibilities as factfinders, which is forbidden." In sum, Perry argues, the trial justice removed from the jurors their job to determine the cause of death. Through his attorney's vigorous cross-examination of the state's medical examiner, Perry maintains, many reasons emerged why this expert's testimony should have been partially or completely rejected by the jury—especially because the causation evidence linking the shooting to Lewis's death three months later was by no means conclusive. Thus, as a result of this improper instruction, Perry argues, his motion for a new trial should have been granted because the trial justice fatally undercut his ability to argue reasonable doubt to the jury.

The state responds by observing that the trial justice's concluding remarks on the expert testimony in this case "may not have been necessary, but, [they were] an accurate summary of the evidence already before the jury." It also argues that the challenged statements did not impermissibly invade the province of the jury, particularly when considered in light of the complete charge that the trial justice gave to the jury concerning expert-opinion evidence.

When this Court reviews challenged jury instructions, we do so holistically. Put differently, we do not review jury instructions in a piecemeal fashion. *See Baccari v. Donat,* 741 A.2d 262, 264 (R.I.1999) (per curiam). Thus, "[w]e shall not exaggerate out of context a single word or phrase or sentence in an instruction; rather, the challenged portion will be examined in the context of the entire instruction." *State v. Brezinski,* 731 A.2d 711, 713 (R.I.1999) (per curiam). When viewed in their entirety, we hold that the instructions in this case concerning expert-opinion evidence did not violate any of Perry's rights.

The situation at bar is similar to the one that this Court faced in *State v. Ferola,* 534 A.2d 173 (R.I.1987). There, the trial justice had instructed the jury that, to rule in favor of the defendant, the jury would have to disbelieve the medical examiner's unequivocal opinion that the manner of death was a homicide. *Id.* at 175. The trial justice told the jurors that he was not invading their province, but was only guiding them in the process of reasoning that would be necessary to reach a rational determination of fact. *Id.* In upholding these instructions, we stated that "[a] trial justice's instruction to the jury is not a mere abstract formulation of principles of law." *Id.* Most significantly, we concluded that the trial justice "was not in error in stating to the jury that defendant's theory or statement was not reconcilable with the findings of the medical examiner." *Id.*

Here, when assaying the propriety of the trial justice's statements to the jury about the medical examiner's testimony, we must do so in the context of the jury instructions as a whole. Previously, the trial justice had instructed the jury, in pertinent part, as follows:

"You, the members of the jury, are the sole judges of the facts.

* * *

"Credibility of witnesses is a question exclusively for your determination and no one else's.

* * *

"You do not have to believe something to be true simply because a witness has said it is true if, in the light of all of the facts and circumstances which you do believe, you find that that witness was wrong.

* * *

"In other words, you weigh and assess the credibility of a police officer just as you would that of the defendant, just as you would that of any other witness in this case.

* * *

"You are to consider expert opinion in the same manner as the testimony of any other witness and to determine disputed issues according to your own judgment on all the evidence, enlightened, but not controlled, by the opinion of an expert.

* * *

"You may consider and accept all, part or none of an expert's testimony.

* * *

"It's important to note, however, that uncontradicted, unimpeached expert testimony may not be arbitrarily discarded. But you still must consider its probative force in the light of all of the evidence, and give it the weight to which end it may lead."

In light of these other instructions and considering the trial justice's challenged remarks in the overall context of what he told the jury about expert evidence, we are not persuaded that he committed reversible error because of his concluding remarks about the medical examiner's testimony. Merely by informing the jury that it had to "weigh" the only medical-expert's

opinion it had heard—to wit: that the gunshot wounds caused the decedent's death—we do not believe the trial justice was thereby telling the jury that it must accept the medical examiner's opinion as true and correct. Moreover, we hold that the challenged statements did not impermissibly invade the province of the jury—nor unfairly comment upon Perry's failure to call a medical witness—particularly when they are viewed in light of the charge as a whole, a charge that included the specific instruction that "you [the jury] may consider and accept all, part or none of an expert's testimony." Significantly, the trial justice's challenged statements were indeed accurate. Although Perry faults the trial justice's timing and placement of these comments at the end of his remarks on expert-opinion evidence, we do not believe that this statement served to cancel out or to override all the other instructions the trial justice previously had given to the jury on this subject. Hence, we reject Perry's argument on this point.

## II

### Curtailing Defendant's Final Argument

During his opening statement, the prosecutor outlined for the jury certain testimony that he expected it would hear from the witnesses he intended to call to the stand during the trial. He told the jurors that they would hear from, among other witnesses, a certain jailhouse informant named John Brown. According to the prosecutor, Brown was expected to testify that, while Perry was incarcerated at the Adult Correctional Institutions (ACI) with Brown, Perry

"[b]asically couldn't keep his mouth shut, was talking about the incident, was talking about, on that note, how he 'smoked that nigger,' how he shot him with his automatic, why, he can't understand that he is being charged with mur-

der because the guy didn't die that night."

Although the state actually brought Brown into the courtroom (outside the presence of the jury) in preparation for calling him to the witness stand during its direct case, he apparently balked at testifying and was never called as a prosecution witness. And even though the trial justice suggested that Brown may have refused to testify because he felt intimidated by supporters of the defense, the record does not reveal why the state decided not to call him as a witness.

During his closing argument, Perry's attorney alluded to Brown's failure to testify as follows:

"Think about what the state promised you in its opening statement. The state promised you at the end of the opening statement you would hear some of that testimony about this Tim Kelly. They said, '[y]ou are going to hear it in Rodney's own mouth through the testimony of John Brown,' they told you."

At that point, however, the prosecutor objected and the court sustained the objection. Although the prosecutor moved to strike the defense's reference to Brown, that motion was neither granted nor denied. At sidebar, the prosecutor argued that Brown's testimony was not part of the state's case. He suggested that if the defense was going to get into this subject, he would be asking the court to allow him to reopen the state's case so that he could call a witness to explain why Brown did not testify. The trial justice ruled that he was "not going to allow any exposition of Mr. Brown" and that the jury was "going to be able to go on what evidence they have, not what evidence they don't have." In doing so, he expressly relied upon Rule 16(e) of the Superior Court Rules of Criminal Procedure (precluding the parties from

commenting at trial upon the fact that witnesses designated during pretrial discovery as intended witnesses have not been called upon to testify at trial).

We hold that, in preventing the defendant from arguing to the jury about the prosecution's failure to call Brown as a witness, the trial justice erred. Rule 16(e) would apply here if the prosecution merely had named this witness in a discovery response under Rule 16(a)(6) as someone it expected to call at trial, but then failed to do so. If that were all that had occurred, then no defense argument could be made at trial about the state's failure to call this witness to the stand. Rule 16(e), however, does not govern a situation such as the one in the case at bar in which the prosecution has identified such a witness and described his or her expected testimony in its opening statement to the jury. The jury is not necessarily made aware of potential prosecution witnesses that are merely listed in the state's discovery responses as intended witnesses; but it is a different matter when the prosecutor tells the jury in his opening statement about one or more specific witnesses that the state will call to testify at trial and what particular testimony it expects these witnesses to provide. Thus, we have expressly stated that "although *defense counsel may comment on the prosecution's failure to call witnesses in a case,* the prosecutor may not respond in kind." *State v. LaPointe,* 525 A.2d 913, 914 (R.I.1987). (Emphasis added.)

We are of the opinion that, having referred to Brown's expected testimony in his opening statement and then having failed to call him as a witness, the prosecutor left himself open to the very type of unfulfilled-promises and reasonable-doubt arguments that Perry's lawyer wished to make in summing up to the jury. Although Brown may well have been too intimidated to testify, the prosecution took

its chances in this regard when it not only mentioned him by name in its opening statement, but also went on to tell the jury, in graphic terms, what it expected Brown to testify about when he took the stand. Particularly memorable was the prosecutor's representation to the jury in his opening statement that Brown would testify that Perry had bragged to him in prison about "how he 'smoked that nigger,' how he shot him with his automatic." The failure of the prosecution to call this witness and to introduce this statement to the jury certainly was fair game for the defense to comment upon in closing argument. Thus, the trial justice's only reason for curtailing the defense's argument on this point—his misplaced reliance upon Rule 16(e)—was inappropriate.

Moreover, contrary to the state's position, there is simply no evidence in the record that Brown was in fact "too intimidated to testify." If this were indeed the case, then it could have put him or someone else on the stand and attempted to create a record on this point. In any event, the present record is simply insufficient to substantiate any suggestion that this was in fact the reason why he was not called to testify. But even if it were so, the defense was still entitled to comment upon the prosecution's failure to produce this witness, especially when his expected testimony played such a dramatic role in the prosecution's opening statement, yet it failed to call him to the stand during the trial.

Nevertheless, we remain unconvinced that the trial justice's error requires us to vacate the conviction and remand this case for a new trial. Although the trial justice aborted the attempts of Perry's lawyer to argue about the significance of Brown's failure to testify there was no indication that the prosecution was guilty of bad faith in not calling Brown to

the stand or that Perry suffered irremediable prejudice as a result of the prosecution's opening remarks about Brown and his expected testimony. Indeed, Perry never moved for a mistrial and he never requested any particular jury instructions from the trial justice concerning the prosecutor's unfulfilled opening remarks about Brown's expected testimony. After the state failed to call Brown as a witness and after the court had denied Perry's lawyer the opportunity to argue about Brown's nonappearance, it was incumbent upon the defense to request either one or both of these measures if Perry believed that the prosecution's opening statement about Brown's expected testimony might have proven unduly prejudicial to him.

Our conclusion on this issue derives from the general rule that a prosecutor's remarks during opening statements "do not constitute reversible error unless incurable prejudice is shown." *State v. Micheli*, 656 A.2d 980, 982 (R.I.1995). *See also State v. Ware*, 524 A.2d 1110, 1112 (R.I.1987) (holding defendant not incurably prejudiced by prosecution's opening statement referring to a witness who never testified at trial). Here, although Brown never testified, another witness (Juan Wilson) did do so. Wilson, like Brown, had been imprisoned with Perry at the ACI, and he told the jury (as Brown was supposed to do) that Perry had admitted to him while they were in prison together that Perry had indeed shot Lewis. Wilson also provided telling details of the crime, such as its location, Perry's motive, the defense's trial strategy, and Perry's prediction of the trial outcome. In addition, the jury heard testimony from an eyewitness to the shooting who identified Perry as the shooter. It also learned from several other witnesses about Lewis's dying declarations and his excited utterances concerning how Perry had shot him. Thus, wholly apart from Brown's failure to

testify and the court's error in barring the defense from arguing about the significance of this failure, the independent evidence pointing to Perry's guilt was both compelling and overwhelming and, thus, more than sufficient to sustain the conviction. Finally, during his instructions to the jury, the trial justice admonished the jury that arguments or statements of counsel are not evidence and are not to be considered in determining the truth of the issues.

Given the substantial additional evidence establishing Perry's guilt as Lewis's shooter, we hold that the trial justice's error in preventing the defense from arguing about the significance of Brown's failure to testify was not so prejudicial as to require a new trial, nor were the prosecutor's opening remarks about what it expected Brown to say at trial so prejudicial as to warrant reversal.

### III

### Alleged *Brady* Violation

■ After Perry's conviction, his attorney argued a motion for a new trial based upon "newly discovered" evidence. This evidence consisted largely of a recantation by an eyewitness, one Tim Kelly. During his testimony at the motion for a new trial, Kelly recounted how a detective had told him before the trial that if he experienced any problems as a result of testifying against Perry, then the state would relocate him after the trial. Indeed, after the trial, the state actually purchased Kelly an airline ticket to another locale (though he never used it). But Perry seized on Kelly's testimony about this ticket at the new-trial hearing and cited this testimony in filing a separate motion for a new trial on the basis of an alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Perry asserted that

the state had failed to disclose this information to him before trial, thereby depriving him of his right to impeach Kelly's motives and reveal his bias to the jury.

During the hearing on this motion, the prosecutor admitted that Kelly had been told before testifying that "if it got to a point where he felt unsafe and wished to leave town, * * * I would submit a request [to relocate him at the state's expense]." The prosecutor also noted that the state actually had processed Kelly's request for such a ticket after the trial because Kelly had been assaulted physically before he testified at the trial. Indeed, much of the prosecution's cross-examination of Kelly during the new-trial hearing elicited Kelly's admitted fear for his own safety because Perry's supporters had assaulted Kelly during the trial for testifying against him.

At the hearing on the motion for a new trial, Kelly testified that the state had informed him before he testified at trial that it would relocate him if he experienced any problems or if he felt unsafe after testifying for the state. But Kelly did not request that the state purchase a plane ticket for him to an out-of-state locale until after he had testified. Indeed, Kelly had previously recanted his eyewitness identification of Perry under pressure from Perry's relatives, a fact that was apparent to the jury during the trial. Moreover, there is no evidence in the record of any deliberate nondisclosure by the prosecution of its plane-ticket discussions with Kelly, and Perry has not sustained his burden of showing that this evidence, had it been disclosed, would have affected the outcome of this case. Because there is no evidence of any deliberate nondisclosure, we are not required to grant a new trial based upon the standard announced in *State v. Wyche*, 518 A.2d 907, 910 (R.I. 1986) (holding that "[w]hen the failure to

disclose is deliberate, this [C]ourt will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; we shall simply grant the defendant a new trial").

Nor did Perry sustain his burden of showing that there was a "reasonable probability" that, if the plane-ticket discussions between Kelly and the state had been revealed at trial, then the damage to Kelly's credibility would have been sufficient to persuade the jury to reach a different verdict. *See Lerner v. Moran*, 542 A.2d 1089, 1092 (R.I.1988). In fact, the jury may well have heard this evidence and concluded that Kelly was an even more credible witness in light of the fact that he still chose to testify despite the tremendous pressure he was under because of the threats. After all, he did so with only the chance—but no promise—of securing a post-trial plane ticket out of town if he still felt threatened after testifying. In other words, the mere possibility of the state's providing Kelly with a plane ticket to leave the state if, after testifying, Kelly still felt threatened, asked the state for a relocation ticket, and the state then acted favorably upon his request was far short of the elaborate and specific inducement offered by the state in *Lerner*, in which the state promised the witness income for the rest of his natural life, a new identity, and relocation in exchange for his testimony. *Id.* at 1091.

And even if the evidence of this potential consideration had been sufficient to impeach Kelly's credibility, it is unlikely that the jury would have come to a different verdict. Besides Kelly's testimony that Perry was the shooter, the state offered the testimony of an emergency medical technician and a police detective who heard the victim's dying declarations that Perry was the shooter, first in the ambulance on the way to the hospital and then

again at the hospital. The state also produced Juan Wilson, who testified that Perry admitted to him while they were incarcerated together that he was the shooter. Therefore, even if Kelly could have been discredited by these plane-ticket discussions with the state, it is unlikely that the outcome of this case would have been different.

Finally, we do not believe that the prosecution was guilty of a *Brady* violation in failing to disclose its communicated willingness to consider relocating Kelly if he felt threatened as a result of his trial testimony. We note that the trial justice rejected Kelly's testimony on this subject at the motion for a new trial on the grounds that it was incredible. Moreover, in contrast to *Lerner*, this is not a case in which the jury would have found Kelly's credibility suspect if it had known that the state had told him it would consider relocating him if he still had problems or felt unsafe after his trial testimony. Indeed, the jury knew that Kelly previously had recanted his identification of Perry as the shooter because he had felt pressured by Perry's relatives. Thus, it already knew that Kelly was a shaky witness, and the mere possibility that the state might help him to relocate after the trial would not have changed the jury's impressions about him on this score.

At the motion for a new trial, the court questioned the prosecutor about the plane ticket. The prosecutor told the trial justice that Kelly had been told that "if it got to a point where [Kelly] felt unsafe and wished to leave town, I told him that I would submit a request [to relocate]." That "request was done after the trial" and, according to the prosecutor, he submitted the request because of "the events that had occurred during the course of the trial where [Kelly] was assaulted prior to his testimony in the courthouse." Because

the trial justice did not believe Kelly's version of what the state's representatives had told him, the prosecutor's admission is all that supports this contention. The prosecutor stated that he told Kelly he would submit a request to relocate him if things got to a point where Kelly felt unsafe and wished to leave the area after testifying for the state. This, we hold, was too attenuated and contingent a communication to a prosecution witness to constitute the type of promise that had to be disclosed under *Brady* on pain of constituting reversible error upon the state's failure to do so. In any event, given the jury's knowledge of Kelly's previous recantation because of perceived pressure to do so from Perry's relatives, we do not believe that the prosecution's nondisclosure of its communication to Kelly about the possibility of assisting him with a post-trial relocation after testifying—if the witness so requested and if the state acted favorably upon such a request—constituted reversible error.

### Conclusion

For these reasons, we affirm the conviction and deny the appeal.