Thomas CONTOIS et al.

v.

TOWN OF WEST WARWICK et al.

No. 2003–379–Appeal.

Supreme Court of Rhode Island.

Dec. 17, 2004.

eight-year-old son Zachary. The plaintiffs raise several issues in their appeal of a Superior Court judgment finding that the defendants, the Town of West Warwick and town rescue workers, were not grossly negligent in their delivery of emergency medical treatment to Zachary Contois. The plaintiffs urge this Court (1) to formally adopt the loss of chance doctrine, (2) that the trial justice's failure to charge the jury on that doctrine confused the jury in light of the plaintiffs' expert testimony, and (3) that the trial justice erred by including an intervening cause instruction in her charge to the jury. For the reasons stated herein, we hold that the loss of chance doctrine does not apply to the instant case. Additionally, we hold that although the trial justice erred by instructing the jury on intervening cause, as it was inappropriate to the facts of the case, the error was harmless. Thus, we affirm the judgment of the Superior Court.

Michael Coleman, Providence, for Plaintiff.

Kathleen M. Daniels, Marc DeSisto, Providence, for Defendant.

Before WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

FLAHERTY, Justice.

The plaintiffs, Thomas and Deborah Contois, have suffered a loss so profound that no mere judicial decision could ever provide a remedy. However, it falls upon this Court to address their appeal and their attempt to hold responsible those they claim contributed to the death of their

### Facts and Procedural History

Zachary Contois passed away in the early morning of March 19, 1999, three days shy of his ninth birthday. During the night preceding his death, Zachary's temperature increased to dangerous levels. Because Zachary was a child with a history of seizures often triggered by high fever, Deborah Contois faithfully monitored her son throughout the night. At the recommendation of an on-call physician, she gave him fever-reducing medications and kept close at hand the portable suction machine needed to help clear Zachary's mouth of vomit during seizures.[1]

At approximately 5:00 a.m., after Zachary's temperature reached nearly 104 degrees, Mrs. Contois again contacted the

---

1. According to Dr. Peter Terry, one of plaintiffs' expert witnesses, aspiration is a significant risk associated with seizures. Because the body's natural reflexes do not function properly during a seizure, the risk of aspirating vomit material through the larynx into the lungs is increased. Suctioning is a method of clearing vomit from the patient's mouth in an effort to prevent the vomit from being aspirated.

on-call physician, and then called 911. Minutes later, a West Warwick fire truck and a rescue vehicle arrived, each carrying defendant Emergency Medical Technicians (EMTs). Mrs. Contois informed the rescue workers of Zachary's medical history, current symptoms, and treatment needs. After assessing Zachary's vital signs, the EMTs decided to walk Zachary to the rescue vehicle parked in front of the Contois' home. Soon after being placed in the vehicle, Zachary began to seize and vomit. The EMTs immediately turned Zachary onto his left side, and, although the parties disagree about the timing of the events that followed, it is undisputed that he was suctioned.

The plaintiffs contend that a delay of approximately one minute in suctioning their son doomed any chance Zachary had to survive the seizure and resulting aspiration of food materials into his airways.[2] They argue that the EMTs' failure to act promptly deprived their son of a substantial chance to survive the incident. The defendant EMTs respond that there was no delay in accessing and utilizing the suctioning device in their efforts to prevent aspiration and asphyxiation. The defendants maintain that they immediately retrieved and activated the necessary equipment, that Mrs. Contois took the device from them and attempted, with some difficulty, to suction Zachary herself, and that after she handed the device back to the EMTs, they suctioned Zachary for sev-

eral seconds, stopping only to allow him to take a breath.

After clearing Zachary's mouth of vomit, the EMTs noticed that Zachary was having difficulty breathing, and they began efforts to resuscitate him. The rescue vehicle then departed for Kent County Hospital, but, tragically, Zachary was pronounced dead within twenty minutes of arrival at that facility. Doctor Elizabeth Laposata, the chief medical examiner for the State of Rhode Island, performed an autopsy and determined Zachary's cause of death to be asphyxia due to massive aspiration[3] of gastric contents associated with seizures. Nearly two years later, in March 2001, plaintiffs brought a negligence action against defendants, the Town of West Warwick and the individual EMTs involved in the events of March 19, 1999. They alleged gross negligence and negligent infliction of emotional distress, and requested both compensatory and punitive damages.

After a trial in the Superior Court, a verdict was returned in favor of defendants. In response to the following special interrogatory, posed as to each defendant, the jury responded in the negative.

"Do you find that [defendant] was grossly negligent in the delivery of emergency medical services to Zachary Contois on March 19, 1999, and, if so, do you find that such gross negligence was a proximate cause of the death of Zachary Contois?"

2. Mrs. Contois did not specifically allege a sixty-second delay until nearly two years after Zachary's death. In response to opposing counsel's interrogatory about the length of the delay, she looked at her watch, and then played out the situation in her mind. When she looked back down at her watch, sixty seconds had passed.

3. At trial, Dr. Laposata testified to the meaning of "massive" in the context of blockage

and aspiration. She stated that "when you get material in the airways, it obstructs all the airways. That would be described as massive obstruction of the airway. That doesn't actually take much volume to do. So massive refers to massive obstruction of the airways, not necessarily a massive amount." The autopsy report documents that the gastric contents consisted of less than ten cubic centimeters of food material.

The jury found that defendant EMTs were not liable in their delivery of emergency medical treatment to Zachary Contois, and that defendant Town of West Warwick was not liable in its training and supervising of the individual EMTs. Because the jury did not find defendants to be grossly negligent, it did not reach the issue of negligent infliction of emotional distress. Subsequently, plaintiffs filed a motion for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure, alleging that the verdict was against the fair preponderance of the evidence and failed to do substantial justice between the parties. In response, defendants renewed their earlier motion for judgment as a matter of law pursuant to Rule 50(b) of the Superior Court Rules of Civil Procedure.

The Superior Court denied both motions. Sitting as a "superjuror," the trial justice reviewed the evidence and credibility of the witnesses at trial, determined that the verdict was not against the fair preponderance of the evidence, and found that the jury's verdict was a valid response to the merits of the case. With respect to defendant's motion for judgment as a matter of law, the trial justice, without assessing the credibility of the witnesses or weighing the evidence, found that factual issues were present as to the existence of a delay and the moment of aspiration, and that reasonable minds could have drawn different conclusions from the evidence. Therefore, the Court denied the renewed motion for judgment as a matter of law and ordered that the verdict stand.

On appeal to this Court, plaintiffs allege that the trial justice's jury instructions were deficient in two respects. First, Mr. and Mrs. Contois contend that the trial justice, after allowing testimony over objection consistent with the loss of chance doctrine, failed to charge the jury on the doctrine as they requested, thereby confusing the jury.[4] They argue that because the trial court allowed their experts to testify about Zachary's loss of chance of survival, that doctrine should have been part of the jury instruction, and, further, that this Court should formally adopt it as part of Rhode Island common law. Second, plaintiffs appeal the trial justice's instruction on intervening cause. They contend that the evidence was not sufficient to warrant such an instruction.

## Standard of Review

▮▮▮▮ The plaintiffs argue that the trial justice erred by failing to charge the jury on the loss of chance doctrine and by instructing the jurors on intervening cause. The standard of review for jury instructions is well settled. "[T]he charge given by a trial justice need only 'adequately cover [ ] the law.'" *Plourde v. Myers*, 823 A.2d 1138, 1143 (R.I.2003) (quoting *State v. Hurteau*, 810 A.2d 222, 224–25 (R.I.2002)). On review, this Court examines the instructions in their entirety to establish the manner in which the jury would have understood them. *Id.* We "'will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered.'" *Parrella v. Bowling*, 796 A.2d 1091, 1101 (R.I.2002). "An erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Montecalvo v. Mandarelli*, 682 A.2d 918, 922 (R.I.1996) (quoting *Brodeur v. Desrosiers*, 505 A.2d 418, 422 (R.I.1986)).

---

**4.** We do not approve of this practice. A trial justice should alert counsel that a requested instruction will not be given as soon as that decision is reached. If the trial justice reserves deciding the motion, counsel should be so informed.

## Analysis

### I

### Overview of the Loss of Chance Doctrine

 The plaintiffs urge this Court to formally adopt the loss of chance doctrine as an alternative to traditional notions of proximate causation. Tort law ordinarily focuses on negligence and proximate cause. " 'It is well settled that in order to gain recovery in a negligence action, a plaintiff must establish * * * proximate causation between the conduct and the resulting injury * * *.' " *English v. Green,* 787 A.2d 1146, 1151 (R.I.2001). " '[P]roximate cause is established by showing that but for the negligence of the tortfeasor, injury to the plaintiff would not have occurred.' " [5] *Id.*

In contrast to traditional theories of tort liability, the loss of chance doctrine presents a more liberal and expansive view of causation. Loss of chance occurs when "the defendant's negligent conduct caused the plaintiff to lose a chance to avoid the ultimate harm." *Mead v. Adrian,* 670 N.W.2d 174, 186 (Iowa 2003) (Cady, J. concurring).[6] It remains necessary for a plaintiff alleging loss of chance to first establish a duty and breach of that duty. *See id.* at 186. However, rather than prove that the breach of duty proximately caused the harm, the plaintiff need only establish that "defendant's negligence was a proximate cause of the lost chance to avoid the ultimate harm." *Id.* Crucially, "recovery is consequently predicated on proof that the medical negligence, whether based upon an incorrect diagnosis or improper or untimely treatment, caused the loss of chance for a better outcome." *Id.* at 187.

In general, there are three approaches courts have taken when addressing loss of chance. *See United States v. Cumberbatch,* 647 A.2d 1098, 1100 (Del.1994). "The first approach is to reject the doctrine as being contrary to traditional principles of tort causation (the 'traditional approach'). The second is to adopt the doctrine as an exception to traditional causation standards (the 'relaxed causation approach'). The third approach is to adopt the doctrine as a method of compensating the lost chance of survival, rather than the death itself (the 'proportional approach')." [7]

---

**5.** In their complaint, plaintiffs alleged gross negligence on the part of defendants because under Rhode Island law, EMTs are immune from liability unless guilty of gross negligence or willful misconduct. *See* G.L.1956 § 23–4.1–12.

**6.** In *Mead v. Adrian,* 670 N.W.2d 174 (Iowa 2003), Justice Cady of the Supreme Court of Iowa provides a detailed history and explication of the loss of chance doctrine in a separate concurrence. In addition to setting out the basic principles of the doctrine, Justice Cady reveals three key points that must be kept in mind. First, "loss of chance is a separate theory of recovery from a traditional negligence claim that is normally brought as an alternative claim in a traditional negligence action." *Id.* at 186 (Cady, J. concurring). Second, "the injury for which recovery is sought under a loss of chance claim is not the traditional damages associated with a negligence claim, but is the lost chance of avoiding the ultimate harm sustained." *Id.* Third, "a method must exist for the jury to determine the value of the loss of chance." *Id.* at 187.

**7.** Some of the courts which have adopted the loss of chance doctrine have done so in reliance on the Restatement (Second) *Torts* § 323 at 135 (1965). *Jones v. Owings,* 318 S.C. 72, 456 S.E.2d 371, 373 n. 1 (1995). *See generally Scafidi v. Seiler,* 119 N.J. 93, 574 A.2d 398 (1990); *Roberts v. Ohio Permanente Medical Group, Inc.,* 76 Ohio St.3d 483, 668 N.E.2d 480 (1996); *McKellips v. St. Francis Hosp., Inc.,* 741 P.2d 467 (Okla.1987); *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981). Section 323 of the Restatement provides in pertinent part:

*Id. See also Jones v. Owings,* 318 S.C. 72, 456 S.E.2d 371, 373 (1995). *See generally Crosby v. United States,* 48 F.Supp.2d 924, 927 (D.Alaska 1999) (the "proportional approach" is also known as the "pure" standard).

Acceptance of the loss of chance doctrine would present a host of potential problems, particularly because of the "very real concern that expanded recognition of the loss of chance doctrine could threaten to swallow whole the equitable, established principles of causation and damages that have guided tort law for centuries." *Mead,* 670 N.W.2d at 185. In a recent decision, the Supreme Court of Vermont, after a lengthy discussion of the benefits and disadvantages of loss of chance, refused to accept the doctrine, citing the potentially great harm posed to established professional standards and theories of recovery. The court questioned the impact of loss of chance not only on the practice of medicine and the costs involved, but also on society in general, where loss of chance, when applied to other professions, could result in "awarding damages to an entirely new class of plaintiffs who formerly had no claim * * *." *Smith v. Parrott,* 175 Vt. 375, 833 A.2d 843, 848 (2003).

Also rejecting the doctrine, the Supreme Court of South Carolina held that " 'the loss of chance doctrine is fundamentally at odds with the requisite degree of medical certitude necessary to establish a causal link between the injury of a patient and the tortious conduct of a [medical provider].' " *Owings,* 456 S.E.2d at 374. The Supreme Court of Ohio initially declined to adopt the doctrine, ruling that a "strong intuitive sense of humanity tends to emotionally direct us toward a conclusion that in an action for wrongful death an injured person should be compensated for the loss of any chance for survival, regardless of its remoteness. However, we have trepidations that such a rule would be so loose that it would produce more injustice than justice." *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97, 103 (1971). That logic was reversed, and *Cooper* overruled, when the Ohio court decided to adopt loss of chance and discard its previously "harsh" views. *Roberts v. Ohio Permanente Medical Group, Inc.,* 76 Ohio St.3d 483, 668 N.E.2d 480, 484 (1996). Despite the court's earlier concerns, it ruled in favor of "justice and fundamental fairness," holding that "[a] patient who seeks medical assistance from a professional caregiver has the right to expect proper care and should be compensated for any injury caused by the caregiver's negligence which has reduced his or her chance of survival." *Id.* Although the loss of chance doctrine presents apparent potential problems, it appears that there is a trend favoring adoption.[8]

"Negligent Performance of Undertaking to Render Services. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize is necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm * * * ." Restatement (Second) *Torts* § 323 at 135.

The Restatement standard is extremely relaxed, allowing for recovery when a defendant's negligence increased the risk of harm by any degree. *See Crosby v. United States,* 48 F.Supp.2d 924, 926 (D.Alaska 1999).

8. Approximately twenty-one states recognize some degree of loss of chance, including Alabama, Arizona, Arkansas, Colorado, Georgia, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Montana, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, West Virginia, Washington, and Virginia. The states that have refused to recognize loss of chance include Delaware, Florida, Idaho, Kentucky, Maryland, Minnesota,

This case presents our first opportunity to examine and consider the loss of chance doctrine. To support their argument, plaintiffs direct us to our decision in *Carew v. Khoury,* 668 A.2d 1269 (R.I.1996) (mem.) as an indicator of our willingness to adopt loss of chance under appropriate circumstances. In *Carew,* the plaintiff parents appealed a Superior Court's grant of a directed verdict in favor of the defendant doctor, and this Court affirmed the decision. *Id.* at 1269. Midway through her pregnancy, Mrs. Carew lost her infant twins when, after noticing spotting, she followed her doctor's advice and remained home rather than going to the hospital. The plaintiffs sued for medical malpractice, arguing that if the defendant had admitted Mrs. Carew to the hospital earlier, she could have been treated with labor-prolonging drugs which would have increased the infants' chances of survival. *Id.* The Superior Court granted a directed verdict after excluding the plaintiffs' expert witness, and we affirmed on that ground alone, without giving weight to the plaintiffs' theory of recovery. Although we may revisit the loss of chance doctrine under an appropriate factual scenario, we hold that for the reasons set forth here the facts presented in this case are inadequate under any of the three recognized approaches.

## II

## Application of the Loss of Chance Doctrine

In those jurisdictions that have adopted the loss of chance doctrine, the cases have tended to follow a particular pattern. Each case presents a clear act or omission on the alleged tortfeasor's part preceding harm or death, and the question exists as to whether or not that negligence deprived the injured party of an appreciable chance of survival. In *Blinzler v. Marriott International, Inc.,* 81 F.3d 1148, 1154 (1st Cir.1996), the Circuit Court applied New Jersey law and refused to disturb a jury's finding, based on the loss of chance doctrine, that the defendant hotel's negligence constituted a substantial factor in the death of a hotel guest. There, a hotel operator waited fourteen minutes to call an ambulance after a guest requested help for her husband, who was exhibiting signs of a heart attack. Upon arrival, the paramedics were able to resuscitate the man, although he subsequently died of brain damage suffered as a result of being denied more immediate cardiopulmonary resuscitation. In applying loss of chance to the rescue context, the court found that "defendant's failure promptly to call an ambulance negated a substantial possibility that [plaintiff] would have survived." *Id.* at 1152. Without the delay, brain damage and death would have been forestalled. *Id.*

Likewise, other cases in which the application of the loss of chance doctrine resulted in liability for negligent acts or omissions follow a similar pattern. In *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981), the Supreme Court of Pennsylvania held that a trial court's failure to instruct on loss of chance constituted error. There, the defendant doctor negligently failed to remove masses in the plaintiff cancer patient's breast and to perform necessary post-operative tests. The Supreme Court of Pennsylvania concluded that loss of chance should have been a part of the jury instructions. *Id.* at 922.

In *Perez v. Las Vegas Medical Center,* 107 Nev. 1, 805 P.2d 589 (1991), the Su-

Mississippi, New Hampshire, South Carolina, Tennessee, Texas, Vermont, and Utah. California, Illinois, and Missouri have had conflicting decisions. *Crosby,* 48 F.Supp.2d at 927–28 (for case citations, *see id.* notes 13 through 15).

preme Court of Nevada reversed a granting of summary judgment made on the grounds that the defendant's alleged negligence could not have been the "legal" cause of death of a patient likely to die from a preexisting condition, and held that sufficient causation existed pursuant to the loss of chance doctrine. In that case, a prison inmate died of a massive brain hemorrhage after physicians failed to diagnose, examine, or treat him for persistent and severe headaches. *Id.* at 590. Because experts testified that the inmate would have had a reasonable chance of survival had he been given prompt and proper medical care, the Court found that the loss of chance theory of causation should have been applied. *Id.* at 593.

■ The case at bar presents a complicated set of facts that cannot be reconciled with the loss of chance doctrine. Despite plaintiffs' claims that their experts testified that a sixty-second delay would have deprived Zachary of a chance for survival, there is a lack of clarity in the testimony that is fatal to plaintiffs' claims. To begin, Dr. Laposata, chief medical examiner for the State of Rhode Island, determined that Zachary died a natural death, from "asphyxia due to massive aspiration of gastric contents associated with seizures following acute febrile illness." Doctor Laposata had no knowledge of the alleged delay in suctioning, but she did testify that it was impossible to know when Zachary aspirated. In her opinion, aspiration could have occurred prior to suctioning, even within seconds of vomiting, or it could have taken place during the suctioning itself.

In addition to Dr. Laposata's testimony, the plaintiffs' two medical experts rendered their opinions on the factors leading to Zachary's death. Doctor James Weiner, a medical examiner for the Commonwealth of Massachusetts, testified that "any delay in suctioning in these circumstances would reduce the chances of successfully resuscitating the child. Or, in other words, any delay in suctioning this child would have increased the likelihood that he would have died." When asked by plaintiffs' attorney whether a sixty-second delay, if proven, "was a substantial factor in bringing about the child's death," and whether such delay "negated a substantial possibility that the child would have survived, Dr. Weiner answered both questions in the affirmative.

At the same time, however, Dr. Weiner testified to his inability to determine when Zachary began to aspirate. Using the autopsy report as a guide, Dr. Weiner concurred with Dr. Laposata's testimony about the amount of gastric contents that Zachary aspirated, and quantified the aspirated material at less than a tablespoon. Doctor Weiner then testified that "[Zachary] could have aspirated that material between several seconds from vomiting to several minutes from vomiting. I couldn't narrow down that time frame any narrower than that."

The plaintiffs' second medical expert, Dr. Peter Terry, a pulmonary and critical care specialist, similarly testified that it was his opinion that a sixty-second delay, if proven, "would have caused a substantial decrease in his chance of survival or loss of his chance of survival." Yet, like Drs. Laposata and Wiener, Dr. Terry also testified that Zachary could have begun to aspirate when he first vomited. In fact, Dr. Terry testified that it was "very probable" that Zachary began to aspirate at that time, and that though very unlikely, it would have been possible for Zachary to aspirate even before the time that he vomited.

Doctor Terry also testified about situations in which aspiration has taken place, and described the more invasive treatment methods necessary to prevent asphyxiation

and fatal harm once gastric contents have been aspirated. Further, Dr. Terry conceded that suctioning is not a fail-safe method of preventing aspiration. In response to defense counsel's question that "if someone suctions that is it, you are in the clear?," Dr. Terry answered "no." Additionally, in regard to the alleged delay, defense counsel further questioned Dr. Terry about the effects of a delay in suctioning.

"Q: Finally, Doctor, a 60–[second] delay you say based on a number of factors would substantially increase or decrease the chance of survival. What would a 30–second delay do?

"A: That would also increase if there was food in the mouth aspirating for a 30–second delay.

"Q: But not as much as a 60–second delay?

"A: One would have to say that."

In view of the testimony elicited in this case, it is our opinion that the loss of chance doctrine is inapplicable and it was not error for the trial justice to decline to instruct on it. We hold that the uncertainty over when Zachary began to aspirate negates a determination that he had any appreciable chance of survival. Thus, even were we to adopt the loss of chance doctrine, the facts here would invite speculation by the jury as to when aspiration occurred.

## III

### Intervening Cause

■ The plaintiffs also contend that the trial justice committed error when she included an instruction on intervening cause.[9] Intervening cause exists when an independent and unforeseeable intervening or secondary act of negligence occurs, after the alleged tortfeasor's negligence, and that secondary act becomes the sole proximate cause of the plaintiff's injuries. *Pantalone v. Advanced Energy Delivery Systems, Inc.,* 694 A.2d 1213, 1215 (R.I.1997). Additionally, "[i]t is well settled that for an independent intervening cause to replace a defendant's original negligence as the proximate cause of an accident, the original negligent conduct must have become totally inoperative as a cause of the injury." *Hueston v. Narragansett Tennis Club, Inc.,* 502 A.2d 827, 830 (R.I.1986).

■ The plaintiffs allege that a sixty-second delay occurred before Zachary was properly suctioned, and that that constituted gross negligence on the part of the EMTs. Mrs. Contois admits that once the device was activated, she took it from the EMT and attempted to suction Zachary herself before handing it back to the EMTs, who then continued the process. However, this evidence is insufficient to support an instruction on intervening cause because the record does not include evidence of any intervening negligent act that may have superceded the alleged initial negligence to become the proximate cause of the resulting injury. Unfortunately, when plaintiff objected to the intervening negligence charge at the sidebar, the trial justice failed to indicate what she perceived to be any intervening cause which would excuse the alleged negligence of the defendants.

9. After properly instructing the jury on gross negligence and proximate cause, the trial justice included the following instruction:

"However, an act is not a proximate cause of an incident if an intervening cause which cannot be reasonably expected, intervenes between the negligent act and the incident so that the intervening act becomes the sole, direct and proximate cause of the incident. If you find that an independent intervening act proximately caused the child's death, then you return a verdict for the defendant."

Although we conclude that the instruction on intervening cause was erroneous, viewed in the context of the charge as a whole, the error was harmless. It is well-established that when reviewing jury instructions, we do so holistically, and not in a piecemeal fashion. *State v. Perry,* 779 A.2d 622, 625 (R.I.2001). " '[W]e shall not exaggerate out of context a single word or phrase or sentence in an instruction; rather, the challenged portion will be examined in the context of the entire instruction.' " *Lieberman v. Bliss–Doris Realty Associates, L.P.,* 819 A.2d 666, 672 (R.I.2003) (quoting *Perry,* 779 A.2d at 625). Therefore, by examining the charge in its entirety, we hold that the trial justice's non-specific instruction on intervening cause, though improper and inapplicable to the facts of the case, was not so far removed from the facts as to constitute reversible error.

### Conclusion

Based on the facts in this case, we hold that the trial justice did not err by declining to charge the jury on loss of chance, nor do we conclude that the instruction on intervening cause constitutes reversible error. Accordingly, and for the foregoing reasons, the judgment appealed from is affirmed. The papers of this case are remanded to Superior Court.