Anton MANDROS et al.

v.

Glenn PRESCOD, M.D. et al.

No. 2007–5–Appeal.

Supreme Court of Rhode Island.

June 3, 2008.

Steven Robinson, Esq., Cranston, for Petitioner (Mandros).

Robert Landau, Esq., Providence, for Respondent (Prescod).

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Chief Justice WILLIAMS, for the Court.

This matter comes to us on the appeal of the plaintiff, Anton Mandros (plaintiff), from a Superior Court judgment on a jury verdict. The jury had determined that the plaintiff failed to prove by a preponderance of the evidence that the defendant, Glenn Prescod, M.D. (Dr. Prescod), was negligent in providing medical services to the plaintiff. The trial justice declined to instruct the jury on the loss-of-chance doctrine, and it is this sole alleged error that caused the plaintiff to file the instant appeal.

This case came before the Supreme Court for oral argument on May 7, 2008, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the record and memoranda filed by the parties, we are of the opinion that this appeal may be decided at this time without further briefing or argument. For the reasons hereinafter set forth, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

In July 2000, plaintiff and his wife, Parskevi Mandros (collectively plaintiffs), filed a complaint against both Dr. Prescod and Koch Eye Surgicenter, Inc.[1] (Koch Eye

---

1. The actual complaint that plaintiff filed named as a defendant Koch Eye Surgicenter, Inc., and asserted that Koch Eye Surgicenter, Inc., also was known as Koch Eye Associates. A motion to dismiss later revealed that Koch Eye Sugicenter, Inc., is not the same entity as

Surgicenter) (collectively defendants), alleging negligence and lack of informed consent. The plaintiff asserted that he suffered damages stemming from Dr. Prescod's alleged negligent treatment of his right eye, which had been diagnosed with a condition known as macular pucker. The plaintiff contended that, as a result of Dr. Prescod's alleged negligence, he had suffered severe irreversible loss of vision in his right eye, pain and suffering, permanent disability, medical-care expenses, loss of income, and other damages.

Several years after filing his complaint, plaintiff dismissed with prejudice all claims for lost earnings and lost earning capacity. Shortly before the trial on this matter commenced, the trial justice dismissed Parskevi Mandros's claims against defendants. At the same time, plaintiff agreed to dismiss his claim of lack of informed consent. Thus, the only issue for trial was whether Dr. Prescod negligently treated plaintiff's right eye.

The following facts were elicited at trial. Doctor Prescod is an ophthalmologist specializing in diseases and surgery of the vitreous humor and retina. He first met with plaintiff in 1995, while employed at Koch Eye Associates. The plaintiff was referred to him by another ophthalmologist because plaintiff had been experiencing early degenerative changes in his right eye, consistent with macular pucker. Doctor Prescod explained that macular pucker is a wrinkle in the retina. It is attributable to the formation of scar tissue and can cause either a distortion in vision or a decrease in vision. The macula is the central part of the retina, approximately four to five millimeters in size.

After monitoring both of plaintiff's eyes since 1995, Dr. Prescod noted, in December 1997, that the scar tissue in plaintiff's right eye had become symptomatic. Doctor Prescod suggested a pars plana vitrectomy with membrane peeling on plaintiff's right eye, and he testified that he had explained to plaintiff, both in the office and over the telephone, the risks and benefits of the surgery. To correct the symptoms from the macular pucker, Dr. Prescod performed the pars plana vitrectomy with membrane peeling on plaintiff's right eye on January 15, 1998.

A pars plana vitrectomy with membrane peeling is a two-part surgery. The first part of the surgery is the vitrectomy, a surgical procedure in which a small tissue in front of the eye, the conjunctiva, is cut. An incision then is made in the pars plana, the part of the eye that does not contain any of the retinal tissue and hence the safest part of the eye into which an incision can be made. Vitreous gel, the substance in between the back of the eye, the retina, and the front of the eye, is removed from the back of the eye to prevent retinal detachment and a clear fluid is put into the eye to prevent the eye from collapsing. After the vitrectomy is complete, an instrument is inserted into the eye through the pars plana to lift off or peel the membrane from the back of the eye.

During the surgery, Dr. Prescod successfully completed the vitrectomy part of the operation. However, when he was peeling the membrane, he observed a complication—subretinal blood or hemorrhaging in plaintiff's right eye, probably caused by the multiple operations plaintiff previously had on this eye. To stop the bleeding, Dr. Prescod first had to create a scar to prevent retinal detachment. He used a laser to weld together the retinal blood

Koch Eye Associates and is not Dr. Prescod's employer. The action against Koch Eye Surgicenter, Inc., was dismissed, and plaintiff's motion to substitute Koch Eye Associates was denied. Accordingly, plaintiff's action remains solely against Dr. Prescod.

vessels and the retina; a scar was created as a result of this procedure.

Doctor Prescod then "put pressure on the bleeding by raising the pressure in the eye" using gas. He then lasered the area where the bleeding was occurring. This procedure requires the use of gas to contract the retina and push it back together; the gas dissipates slowly, over several months.

After the surgery, Dr. Prescod continued to see plaintiff to observe and reevaluate the condition of plaintiff's right eye. Doctor Prescod saw plaintiff the day after the surgery, January 16, 1998, and observed that the gas bubble that was created to stop the subretinal bleeding filled approximately 60 percent of the eye. He explained that the gas bubble obscures a patient's vision; but, once the bubble decreases to less than 50 percent, the patient regains much of his or her vision. One week after plaintiff's initial follow-up visit, on January 22, 1998, Dr. Prescod noted that the gas bubble had decreased to 50 percent. Doctor Prescod testified that because of the obstruction caused by the gas bubble he could not detect any subretinal blood. At subsequent appointments with plaintiff, Dr. Prescod noted that plaintiff's right eye continued to improve and the size of the gas bubble continued to decrease.

On March 3, 1998, Dr. Prescod observed mild scarring on plaintiff's right eye and noted that the gas bubble still was present. He also observed, for the first time, a subretinal hemorrhage that was "dangerously close to the center of the macula." Doctor Prescod acknowledged that although he did not consider this observation of subretinal bleeding to be an indication of choroidal neurovascular membrane (CNVM), a new vessel underneath the retina or in the choroid, he admitted that

such bleeding could indicate the presence of a CNVM.

Doctor Prescod explained that a CNVM is pathological and could harm vision if it is located in the macula region of the eye. A CNVM is evident in macular degeneration and also may form after mechanical trauma to the eye, such as the application of a laser to the retina. In 1998, the primary diagnostic tool used to identify the presence of a CNVM was a fluorescein angiogram, a diagnostic test used to find blood vessel problems in the retina and to diagnose CNVM cases. In a fluorescein angiogram, a dye is administered intravenously and travels to the eye. Several seconds after the dye is introduced, photographs of the eye are taken, revealing any circulation abnormalities. Doctor Prescod did not perform a fluorescein angiogram when he first observed the blood on March 3, 1998, explaining that there was too much blood present and the test would have been ineffective. Instead, he "decided to clinically observe the patient, watch and wait and see what happens with the blood."

During plaintiff's visit on April 2, 1998, Dr. Prescod observed a scar on the macula area as well as some subretinal fluid. He also noted that there was no visible gas bubble and that plaintiff's vision had improved. Doctor Prescod decided not to administer a fluorescein angiogram; he concluded that even if a CNVM was present, a fluorescein angiogram would not have made a difference.

The plaintiff's next office visit was on May 12, 1998. At this appointment, Dr. Prescod observed a fresh subretinal hemorrhage and a scar, and noticed that plaintiff's vision had deteriorated. Because of these conditions, Dr. Prescod performed a fluorescein angiogram. The procedure revealed a large submacular hemorrhage and the presence of a CNVM in the right eye. Doctor Prescod explained that he could not

use a laser to stop the hemorrhaging because it would cause greater damage to plaintiff's right eye. Because of the location of the CNVM, the damage to plaintiff's central vision was permanent and irreversible. The plaintiff made two additional visits to Dr. Prescod's office, in June and October 1998. The plaintiff showed no improvement in his vision at either of these visits.

Doctor Prescod explained to plaintiff that he had central vision loss because of the scar tissue and that although his vision was stable, it probably never would get any better or any worse than its present condition. The plaintiff, however, testified that he did not remember Dr. Prescod informing him of any permanent vision loss in his right eye. Rather, plaintiff alleged to have learned of the permanent loss only after a visit with another physician. According to Charles M. Collins, M.D., a licensed ophthalmologist who has been treating plaintiff since April 2002, plaintiff's vision has not improved.

The deposition of Thaddeus J. Krolicki, M.D. was read in open court. During his deposition, Dr. Krolicki surmised that the CNVM was present in plaintiff's right eye as early as March 3, 1998, and that the proper standard of care for treatment of a CNVM would have been laser surgery. Doctor Krolicki surmised that plaintiff's vision would have improved had he undergone more surgery than had been conducted by Dr. Prescod, stating that "treatment results are more favorable outcomes visually than observation."

Salvatore Loporchio, M.D., an ophthalmologist specializing in retinal disorders, testified that both the development of subretinal blood at the time of surgery and the development of a CNVM are quite uncommon. He further testified that the subretinal blood observed by Dr. Prescod in March 1998 was not treatable; rather,

any incision to the retina to remove blood would "more likely than not" have caused more damage. According to Dr. Loporchio, a fluorescein angiogram was not, at the time of plaintiff's post-surgery visits, part of the standard of care. He concluded that not only would no other information be learned from the test, but the presence of blood in March could not have been differentiated from the blood present at the time of surgery in January. In his opinion, Dr. Prescod met the standard of care in his management of plaintiff's symptoms both during the operation, by using a laser to stop the bleeding, and after the operation, when he performed the fluorescein angiogram in May 1998.

Doctor Prescod also introduced the testimony of Jay S. Duker, M.D., an ophthalmologist specializing in retina and vitreous surgery. Doctor Duker explained that the subretinal blood at the March 1998 visit represented residual blood from the surgery. He further indicated that the presence of a 50 percent gas bubble not only obstructed Dr. Prescod's observation of subretinal blood, but also would have interfered with a fluorescein angiogram test. Doctor Duker concluded that it was "more likely than not" that the presence of subretinal blood did not represent a CNVM.

Doctor Duker also testified that even at the visit on April 2, 1998, the presence of subretinal fluid did not indicate a CNVM. He explained that the blood went away as it would have if it had originated from the operation. If the blood was from a CNVM the blood would not go away; it either still would be present or be larger. He also testified that the standard of care, as of March 1998, did not require Dr. Prescod to perform a fluorescein angiogram at that time, nor would it have changed how plaintiff was being managed or the eventual vision result. Significantly, Dr. Duker tes-

tified that a CNVM laser treatment could have made the outcome worse.

At the close of the testimony, the trial justice granted Koch Eye Sugicenter's motion for judgment as a matter of law because it was not the correct defendant. The trial justice did not rule on Dr. Prescod's motion for judgment as a matter of law on the issue of proximate cause, but instead reserved his decision on this matter.

The trial justice next discussed the issue of jury instructions with the attorneys. Although the loss-of-chance doctrine was discussed at length, the trial justice elected not to instruct the jury on the loss-of-chance doctrine.

During jury instructions, the trial justice explained the four elements of negligence and the duty of care in a medical malpractice case. He explained that plaintiff alleged the following: Dr. Prescod failed to properly diagnose a CNVM that existed in plaintiff's right eye on March 3, 1998, and April 2, 1998; Dr. Prescod failed to exercise professional skill in diagnosing a CNVM by failing to order a fluorescein angiogram; and his failure to do so was a breach of the standard of care that Dr. Prescod owed to plaintiff.

The trial justice informed the jury that Dr. Prescod was expected to use professional skill when attempting to arrive at a correct diagnosis, including using the available diagnostic tests. He explained that plaintiff had the burden of proving that Dr. Prescod had failed to act within the proper standard of care. This determination is measured by the recognized standard of care for reasonably competent physicians practicing in the field at that time. The trial justice explained that Dr. Prescod's decision about whether to perform a fluorescein angiogram on March 3, 1998 or April 2, 1998, depended on an exercise of judgment. Doctor Prescod's

judgment had to be in accordance with accepted standards of medical practice at that time. Finally, the trial justice instructed the jury on proximate cause and damages. After the jury instructions were complete, plaintiff objected to the trial justice's failure to instruct the jury on the loss-of-chance doctrine.

On April 12, 2006, the jury returned a verdict in favor of Dr. Prescod. The jury verdict form asked the jurors whether they found by a fair preponderance of the evidence that Dr. Prescod was negligent in failing to perform the fluorescein angiogram test on March 3, 1998, or April 2, 1998. The jury responded negatively. Because the jury did not find negligence, the jury did not answer the next question, which asked whether Dr. Prescod's negligence was the proximate cause of plaintiff's injury.

A judgment was entered in favor of Dr. Prescod the next day. The plaintiff timely appealed.

## II

## Analysis

On appeal, plaintiff contends that the trial justice erred in failing to instruct the jury on the loss-of-chance doctrine. The plaintiff also requests that this Court recognize the loss-of-chance doctrine as an appropriate theory of recovery in medical malpractice cases.

## A

### Standard of Review

▇ "[T]he charge given by a trial justice need only 'adequately cover [ ] the law.'" *Contois v. Town of West Warwick,* 865 A.2d 1019, 1022 (R.I.2004) (quoting *Plourde v. Myers,* 823 A.2d 1138, 1143 (R.I.2003)). In reviewing the soundness of a jury instruction, this Court will examine

the trial justice's jury instructions as a whole. *Id.* "We 'will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered.'" *Id.* (quoting *Parrella v. Bowling,* 796 A.2d 1091, 1101 (R.I.2002)). We will consider the "interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions]." *State v. Sivo,* 925 A.2d 901, 913 (R.I.2007) (quoting *Saber v. Dan Angelone Chevrolet, Inc.,* 811 A.2d 644, 653 (R.I.2002)). "An erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Id.*

## B

### Jury Instructions

■ In this case, the trial justice instructed the jury on the traditional theory of negligence, but declined to give a particular instruction on the loss-of-chance doctrine.

■ To recover against a physician for medical malpractice, a plaintiff must demonstrate negligence on the part of the physician. *Foley v. St. Joseph Health Services of Rhode Island,* 899 A.2d 1271, 1277 (R.I.2006). The plaintiff first must establish "a standard of care and prove, by a preponderance of the evidence, that the defendant deviated from that standard of care." *Riley v. Stone,* 900 A.2d 1087, 1095 (R.I.2006) (citing *Morales v. Town of Johnston,* 895 A.2d 721, 732 (R.I.2006)). The plaintiff then has the burden of proving a causal connection between the physician's act or omission and the plaintiff's injury. *Foley,* 899 A.2d at 1277.

■ According to the loss-of-chance doctrine, on the other hand, "[l]oss of chance occurs when 'the defendant's negligent conduct caused the plaintiff to lose a chance to avoid the ultimate harm.'" *Contois,* 865 A.2d at 1023 (quoting *Mead v. Adrian,* 670 N.W.2d 174, 186 (Iowa 2003) (Cady, J. concurring)). In its purest form, the loss-of-chance doctrine permits recovery of damages for an injury suffered by a patient whose medical providers negligently deprived the patient of a chance for a better outcome. *See id.*

■ The loss-of-chance doctrine differs from traditional negligence, but it does not represent a distinct cause of action. Rather, loss of chance is an alternative to conventional notions of causation, and requires a more expansive interpretation of causation. *Contois,* 865 A.2d at 1023.

■ In the typical negligence case, the plaintiff must prove proximate cause, which "is established by showing that but for the negligence of the tortfeasor, injury to the plaintiff would not have occurred." *Geloso v. Kenny,* 812 A.2d 814, 818 (R.I. 2002) (quoting *English v. Green,* 787 A.2d 1146, 1151 (R.I.2001)). However, under the loss-of-chance doctrine, the causation standard is relaxed. Rather than prove proximate cause, "the plaintiff need only establish that 'defendant's negligence was a proximate cause of the lost chance to avoid the ultimate harm.'" *Contois,* 865 A.2d at 1023 (quoting *Mead,* 670 N.W.2d at 186).

■ The threshold inquiry in a loss-of-chance analysis is whether the defendant has met the applicable standard of care. It is only after the plaintiff satisfies the burden of proving a deviation from that standard that a fact-finder must determine if there is a causal relationship between the breach and the injury suffered. If, however, the plaintiff fails to demonstrate that the physician failed to abide by the applicable standard of care, the causation inquiry is moot.

In this case, the jury was provided with a verdict form. The first question asked was "[d]o you find that the [p]laintiff has proved by a fair preponderance of the credible evidence that the [d]efendant, Dr. Prescod, was negligent in failing to perform a fluorescein angiogram test on March 3, 1998 or April 2, 1998?" The jury responded in the negative. The verdict form instructed the jury not to proceed if the answer to the first question was "no." Because the jurors did not find that Dr. Prescod was negligent in his treatment of plaintiff, they were not asked to address the second question, which asked whether the negligence was the proximate cause of any damages to plaintiff.

Although the trial justice did not give an instruction on the loss-of-chance doctrine, this Court has ruled that the failure to give a particular instruction in a negligence action is moot given the jury's finding of no proximate cause or no negligence. In *Crum v. Horowitz*, 896 A.2d 736, 737 n. 1 (R.I.2006) (mem.), this Court ruled that the issues the plaintiff raised relating to jury instructions on comparative negligence and burden of proof for comparative fault were moot because the jury found the defendant was not negligent.

Similarly, in *Hodges v. Brannon*, 707 A.2d 1225 (R.I.1998), the plaintiffs contested several of the jury instructions. They alleged, in particular, that the judge had used improper terminology that conflicted with their expert testimony. *Id.* at 1226–27. We determined that the plaintiffs' arguments were moot. *Id.* at 1227, 1227 n. 7. The plaintiffs' theory of recovery in *Hodges* was that the defendant drug manufacturer had failed to warn because its warning label did not address the potential adverse reaction that the plaintiff had experienced. *Id.* at 1227. However, the jury found no proximate cause. *Id.* Accordingly, we reasoned

that if the defendant's drug did not proximately cause the plaintiff's death, then the defendant's failure to warn certainly could not have mattered in the plaintiff's death. *Id.* Consequently, we concluded that all issues relating to the jury instructions were moot. *Id.* at 1227–28.

In this case, the trial justice declined to instruct the jury on the loss-of-chance doctrine, and plaintiff argues that this omission amounts to error. Following the same reasoning as this Court followed in *Crum* and in *Hodges*, the issue of whether the trial justice should have instructed the jury on the loss-of-chance doctrine is moot. The jury did not find that Dr. Prescod had deviated from the appropriate standard of care. Instead, the jurors concluded that he was not negligent. It is only after the jury makes such a finding that the jury can consider causation. Thus, even had the jury been instructed on the loss-of-chance doctrine, it first would have had to conclude that Dr. Prescod was negligent before considering the expanded definition of causation under the loss-of-chance doctrine. Thus, under either theory, the jury would not have reached the issue of causation, and would not have held Dr. Prescod liable.

Accordingly, we conclude that because the loss-of-chance doctrine affects only the causation part of the tort analysis and because the jury never was required to reach the question of causation, the trial justice's failure to instruct on the loss-of-chance doctrine is moot.

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.